```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA   )
                           )
                           )
         v.                )     CRIM. NO. 05-10237-MLW
                           )
ANTOIN QUARLES COMBS       )
```

**TRIAL BRIEF OF THE UNITED STATES**

The United States, by its undersigned attorneys, respectfully submits this trial brief to identify relevant issues in accordance with the Court's Pretrial Order dated December 16, 2005. The trial of this matter is scheduled to begin on March 27, 2006.

The government has filed three motions in limine in connection with the trial of this matter. The motions concern: (I) the admissibility of certain statements made by the defendant during the efforts to recover the gun from his person; (ii)the admissibility of certain excerpts from the Boston Police Department turret tapes containing statements made by the arresting officers during (or immediately after) their recovery of the gun and the arrest of the defendant; and (iii) the admissibility of certain business records of John Jovino Company, Inc. (the New York gun dealer who in January 1977 accepted delivery of the weapon in New York from Smith & Wesson and then

1

resold it approximately a week later to Bob's Sporting Goods in Westport, Massachusetts.  The basis for the admissibility of this evidence is addressed in those motions and more fully below.

I.   **SUMMARY OF GOVERNMENT'S CASE**

On September 7, 2005, a grand jury in this district returned a one-count indictment against Antoin Quarles Combs, a/k/a "Anoine Combs-Quarles," a/k/a "Antoine Combs" (hereinafter "Combs" or "the defendant").  The sole count of the indictment charged that, on May 23, 2005, in Boston in the District of Massachusetts, Combs was in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  The grand jury also alleged that, prior to May 23, 2005, Combs had been convicted of a crime punishable by imprisonment for a term exceeding one year.

This case arose out of car stop that took place in the early morning hours of May 23, 2005 in Boston.  At that time, a 1998 Mercury Moutaineer was stopped after officers had observed it during surveillance of suspected drug activity in the area of Southern Avenue in Boston and only after a computer check on the officers' Mobile Data Terminal ("MDT") indicated that the car's registration had been revoked for lack of insurance.  After the car was stopped and the officers smelled what they believed to be marijuana coming from its interior compartment, all of the occupants were asked to get out.  As Combs (who was a passenger

in the back seat) was getting out of the car, he acknowledged that he had marijuana on him and made a series of movements towards his waist that ultimately revealed a firearm stuck in his waistband.  After Officer Bickerton saw the gun and alerted his partner Officer Conway to its presence, Combs went for the weapon and began to point it in the direction of the officers.  The gun, a .38 caliber Smith & Wesson Model 36 bearing serial number J517421 and containing five rounds of Remington .38 ammunition, was recovered from Combs only after a fierce struggle which resulted in injury to both officers and the defendant.  Three bags of marijuana and some pills were also recovered (one bag and pills were found on the ground immediately after the struggle, and two additional bags of marijuana were later found on Combs).

   The government expects that the evidence at trial will include the following:  At about 2:30 a.m. on May 23, 2005, Boston Police Officers Dean Bickerton and John Conway were in the vicinity of 50 Southern Avenue in Dorchester, MA which they knew to be an area of drug trafficking, when they saw a black Mercury Mountaineer bearing MA Reg 41CL49 stop at that address.  The male passenger in the rear seat got out (later identified as Combs), went to the front door, and then quickly got back into the SUV, which drove off.  The officers attempted to follow the Mountaineer, but lost the vehicle for a period of time as the SUV made a series of turns through a Dorchester neighborhood.

The officers reacquired the Mountaineer minutes later near the intersection of Dorchester Avenue and Ashmont Street. As they followed the car, they ran the license on their Mobile Data Terminal and learned that the registration had been revoked for lack of insurance as of May 14, 2005, thereby indicating that the car could not be legally operated and should be impounded and towed.

The officers activated the emergency lights and siren in their unmarked car and stopped the SUV. Officer Bickerton approached the driver's side and Officer Conway went to the passenger side. None of the three occupants (two women in the front seat, the defendant in the rear passenger seat) were wearing seatbelts and although the driver could produce the vehicle registration, she said she did not have her license on her. The officers also smelled (and saw) marijuana in the vehicle. After getting identifying information from all of the occupants, the officers queried the MDT a second time to determine whether there were any warrants on the individuals. Then Officer Bickerton asked the driver to step out, which she did. The driver went to the rear of the SUV and, in response to questioning as to why the car had stopped at the Southern Avenue house, told Officer Conway that the defendant was a friend of the front seat passenger (Somia Hicks) and that he had asked her to stop at the house on Southern Avenue.

Officers then asked the defendant to get out of the SUV. As the defendant was getting out, Officer Bickerton said he had smelled marijuana and the defendant admitted that he "had weed on me, let me get it." The defendant then started to reach toward his waist, not his pocket. Officer Bickerton removed the defendant's hands from his waist and ordered the defendant to stay within the door frame area. The defendant was visibly nervous and moving about and kept reaching toward his waist. Officer Bickerton repeatedly pushed the defendant's hands away, told the defendant that he (Bickerton) would get the marijuana, and reached for the defendant's hooded sweatshirt himself. When Bickerton raised up the sweatshirt, both officers observed a handgun in the defendant's waistband and Bickerton yelled "gun."

After hearing Officer Bickerton's warning, the defendant and Officer Bickerton both went for the gun-the defendant pulling it out of his waistband with his left hand and Officer Bickerton grabbing it with both his hands-and a violent struggle ensued. Officer Conway had the defendant's right arm pinned, but the defendant was fiercely struggling for control of the gun with Officer Bickerton. As they struggled, the defendant (whose booking sheet indicates that he is 6'4" tall and weighed 215 pounds as of the day of the arrest) was yelling: "I'm going to shoot you mother f--kers. I ain't going back to jail. You all are going to have to kill me." Officer Conway struck the

defendant in the head with the butt of his gun, but even that did not subdue him.

As Bickerton and Conway were struggling to get Combs (and his gun) under control, two other officers (Serra and Ross) arrived in response to Officer Conway's calls for assistance and the four officers took Combs to the ground where (despite the defendant's continuing resistance) Officer Bickerton was finally able to wrest control of the gun from him. Officer Bickerton had squeezed so tightly on the gun during the struggle that his fingernails bled. Officer Conway also suffered some injury to his hand. The defendant was taken to Carney Hospital for treatment.

Officers Ross and Serra seized one bag of marijuana and some pills at the scene. Additional marijuana was also seized from the defendant.

The gun recovered is a .38 caliber Smith & Wesson Model 36 revolver, serial number J517421 that contained five rounds of Remington .38 caliber ammunition.[1] The gun was successfully test-fired by BPD Firearms Examiner Detective Tyrone Camper, thereby indicating that it was "designed or may readily be

---

[1] As set forth above, three bags of marijuana were also recovered from the defendant. One bag of marijuana (and some pills) were recovered from the ground in the location of the struggle. Two additional bags of marijuana were recovered from Combs. Tests were performed at the State Public Health Laboratory that confirmed the presence of marijuana.

converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Detective Camper also examined the catridges found inside the gun and concluded that it is ammunition. See 18 U.S.C. §921 (a)(17)(A)(the term ammunition means ammunition or cartridge cases, primers, bullets or propellent powder designed for use in any firearm). The ammunition was also inspected by ATF S/A Phillip Ball who determined that it is ammunition that had been manufactured outside of Massachusetts and thereby has the requisite nexus with interstate commerce. E.g., United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000)(government's burden regarding interstate commerce is satisfied if it proves that gun was possessed in a state "other than the one in which it was manufactured").

The gun was manufactured at Smith & Wesson in Springfield, Massachusetts.[2] Documents obtained from Smith and Wesson and the ATF's National Tracing Center will establish that the gun was shipped by Smith & Wesson on or about January 27, 1977 to John Jovino Company, Inc. in New York City and that the weapon was thereafter resold by Jovino to Bob's Sporting Goods in Westport, Massachusetts. Additional supporting documents showing the

---

[2] Because of this, S/A Ball is unable to state with certainty that the gun necessarily crossed state lines or a foreign boundary prior to May 23, 2005. The necessary nexus between the gun and interstate commerce will therefore be shown through shipping records from the manufacturer and the purchaser all as set forth in this memorandum.

7

interstate travel of the gun will be offered by the Keeper of the Records of Jovino.

At the time the firearm was seized from the defendant, its grip was wrapped in electrical tape. The gun was analyzed for fingerprints and no useable prints were recovered. However, when the tape was removed, a partial palm print was recovered which was ultimately determined not to be that of the defendant.

The government has filed expert disclosures describing possible expert testimony regarding the fingerprinting. Those disclosures outline possible testimony about the examination that was done, the infrequency with which fingerprints are recovered from weapons such as the firearm in this case, and, among other things, the length of time that the partial palm print could have been on the gun.

## II.  [PROPOSED] STIPULATIONS OF FACT

The government has provided the defendant with proposed stipulations regarding the defendant's prior criminal history, the firearm and ammunition, and the results of the drug testing performed by the State Laboratory on the marijuana seized in connection with the underlying incident. The defendant has not yet indicated what stipulations he will enter into. If the parties agree to any stipulations, they will file them with the Court before trial.

## III. ANTICIPATED EVIDENTIARY ISSUES

1. **Photographs of the scene**. The government expects to introduce photographs showing various locations related to this incident. Although the photographs were not taken on the night that the defendant was arrested, the government believes that they fairly and accurately depict the places involved and are thereby admissible under settled law. E.g., United States v. Holmquist, 36 F.3d 154, 169 (1st Cir. 1994) ("A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer or some other person who was present at the time it was taken."); United States v. Clayton, 643 F.2d 1071, 1074 (5th Cir.1981) ("A witness qualifying a photograph need not be the photographer or see the picture taken; it is sufficient if he recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it.").

2. **Turret Tape recordings**. The government also expects to offer limited portions of the Boston Police Department turret tapes that include statements by the arresting officers made as the incident described above took place. Those statements provide firsthand evidence of the incident as it took place and are admissible under various exceptions to the hearsay rule.

The contents of these recorded statements and the legal basis for admissibility are described more fully in the Motion in Limine already on file with the Court.

**2.  Statements of the Defendant**. The government will also seek to introduce statements of the defendant that took place while the officers attempted to subdue him after the gun was first seen ("I'm going to shoot you mother f----ers. I ain't going back to jail.  You all are going to have to kill me.") Those statements also corroborate the officers version of the events and are therefore directly relevant in that they explain the defendant's actions and confirm that he was in knowing possession of a gun.  Although the defendant's reference to "going *back* to jail" would raise Rule 403 prejudice issues in other contexts, here the jury will already be advised that Mr. Combs is a convicted  felon and hence there will be no prejudice sufficient to outweigh the relevance of the statements at issue.[3]

This matter is also the subject of a motion in limine that has been filed with the Court.

---

[3]     Rule 403 of the Federal Rules of Evidence allows relevant evidence to be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice."  Any claim here that the probative value of this evidence is somehow outweighed by prejudice, or the possibility of confusion or misleading the jury must also fail, particularly if the defendant argues that the gun was planted, thereby putting the credibility of the police officers squarely at issue.  The defendant's obligation in advancing any such argument is to show that any prejudice is in fact "unfair" and substantially outweighs the probative value. No such showing can be made here.

3. **Identification of Marijuana**. As set forth above, there were three bags of marijuana that were seized from the defendant in the course of his arrest. The arresting officers (who are all experienced members of the boston Police Department who are trained to identify marijuana and other drugs and who have in fact collectively made hundreds of seizures of marijuana are expected to testify that, at the time of the seizure, they recognized the contents of the bags to be marijuana all as set forth in the reports previously produced to the defendant. See United States v. Northrop, 972 F.Supp. 183, 185 (W.D.N.Y. 1997)(law enforcement officers permitted to identify marijuana based on training and experience); United States v. Lennick, (police officer with training and experience in six prior drug investigations permitted to testify about marijuana processing). See also United States v. Paiva, 892 F.2d 148, 156-57 (1st Cir.1989) (no abuse of discretion in admitting lay opinion testimony that substance was cocaine where lay witness based opinion on past extensive personal experience with cocaine and personal observations); United States v. Brumley, 217 F.3d 905 (7th Cir. 2001) (agent permitted to testify as to amounts of drugs needed for personal use as opposed to distribution); United States v. Agyen, 842 F.2d 203 (8th Cir. 1988) (DEA agent permitted to testify about street prices for drugs based on experience as undercover and case agent).

     **4. Interstate Commerce Business Records.** Another potential evidentiary issue that the government wishes to address is the admissibility of certain records pertaining to the purchase and shipment of the firearm at issue between Massachusetts and New York by Smith & Wesson ("S&W") and the New York Gun Dealer John Jovino Company, Inc. ("Jovino"). The records at issue show that S&W sold and shipped the gun to Jovino in January, 1977 and that Jovino then resold it to a sporting goods store in Westport, Massachusetts approximately 10 days later. The records and the evidentiary issues they could raise are also the subject of a Motion in limine that has been filed with the Court.

     **5. Rule 609 issues.** The government notes that the defendant and the two other occupants of the Mercury Mountaineer all have substantial criminal records that appear to include convictions that fall within Rule 609. The government will consider further action on this issue once it is provided with a copy of the defendant's witness list.

     **IV. JURY VOIR DIRE QUESTIONS**

     The government's proposed jury voir dire is being filed this day.

     **V. PROPOSED JURY INSTRUCTIONS**

     The government's proposed jury instructions are also being filed this day.

**VI.  SPECIAL ARRANGEMENTS**

The government is not making any requests for special arrangements for trial at this time.  If the Court allows the government to introduce the CDs containing the statements made by Officers Bickerton and Conway, the government would like the opportunity to play them in the courtroom prior to the commencement of trial to determine if the wireless headphone system will be needed.  The government also anticipates that it may refer to certain charts, photographs and to the firearm during its opening statement.  The government will address those issues with defense counsel and the Court prior to trial.

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        UNITED STATES ATTORNEY

Dated: 3/3/06        By:  /s/ John A. Wortmann, Jr.
                                        JOHN A. WORTMANN, JR.
                                        SANDRA BOWER
                                        Assistant U.S. Attorneys
                                        One Courthouse Way
                                        Boston, MA
                                        (617) 748-3207