UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES** ) ) ) ) v. ) ) **ANTOIN COMBS QUARLES** ) ) ) | CR. NO.: 05-10237-MLW |

## MOTION FOR EXCULPATORY EVIDENCE

The defendant, Antoin Combs Quarles, hereby moves this Court to compel the Government to produce any and all documents in its possession regarding any and all proficiency test results taken by Detective Tyrone Camper of the Boston Police Department, a potential expert witness in this case. This request applies to evidence which is within the possession, custody or control of the government, or which is or could by the exercise of due diligence become known to the government. Brady v. Maryland, 373 U.S. 83 (1963).

In support of this motion, defendant states, by and through undersigned counsel, that Tyrone Camper, who is listed as an expert in ballistics in the government's expert disclosure, was reported to have testified at a pre-trial hearing in Suffolk Superior Court that he had taken an in-house proficiency test regarding his ability to examine and correctly analyze firearms evidence. *See* David S. Bernstein, *Bad Ballistics*, Boston Phoenix, October 7, 2005, at 21.[1] According to this article, Officer Camper testified that he knew he had failed some parts of the test. *Id.* However, he testified one week later that he had "come to learn" that he had not failed any of the tests. *Id.*

---

[1] A copy of the article, which was filed in *United States v. Washington*, Docket No. 02-CR-10301-NG is attached as Exhibit 1.

2

      The existence of any such proficiency testing results, whether they indicate the examiner passed or failed, is potentially exculpatory and must be provided to the defense.

                                        Respectfully submitted,
                                        By defendant
                                        Antoin Combs Quarles
                                        By his attorney,

                                        /s/  Scott P. Lopez
                                        Scott P. Lopez, BBO #549556
                                        Law Office of Scott P. Lopez
                                        24 School Street, 8th Floor
                                        Boston, MA  02108
                                        (617) 742-5700

Dated:  March 20, 2006

## CERTIFICATE OF SERVICE

     I, Scott P. Lopez, hereby certify that on the 20th day of March, 2006, I served the within DEFENDANT ANTOIN COMBS QUARLES' MOTION FOR EXCULPATORY EVIDENCE by electronic mail on the following counsel of record at the following address:

Sandra S. Bower
Assistant United States Attorney
United States Attorney Office
One Courthouse Way, Suite 9200
Boston, MA  02210
617-748-3184
Sandra.Bower@usdoj.gov

## NEWS & FEATURES

**Bad ballistics**
**Hundreds of people have gone to prison on the word of Boston's untrained, unqualified, unskilled firearms examiners**

BY DAVID S. BERNSTEIN

The smoking gun. It is the icon of investigative perfection, of irrefutable evidence connecting criminal to crime. Yet it is more than mere symbol: the reports and testimony of the Boston Police Department's (BPD) ballistics unit have been critical to putting hundreds of people in prison since the lab opened 40 years ago, and dozens more every year.

But the Phoenix has discovered that these firearms examiners — the officers who analyze bullets and cartridge casings to determine whether a particular gun was used for a particular crime — are ill-trained and inept. Compared with their counterparts in big cities like New York, smaller cities like Pittsburgh, or states like Illinois, Boston's firearms examiners are amateurs, who would not qualify to work in those other jurisdictions.

The BPD's firearms examiners were not selected based on any particular science background or skill with firearms. They have been given no special training or sent to any classes on ballistics identification. They are given no particular oversight. They have had a recurring problem with misplaced evidence, as BPD firearms examiner Martin Lydon has conceded during testimony.

And when these ballisticians, as they're called, have failed basic proficiency exams (as one recently admitted and then retracted on the stand), their supervisors' response has been to do nothing about it.

Furthermore, some of these BPD personnel appear to have deliberately misled juries. In cases where they only have evidence that could match a bullet or cartridge to a particular brand of gun, they have been willing to report, and testify, that it matches a specific gun.

While DNA experts display their findings with numerical precision, and fingerprint experts demonstrate specific "points of correspondence" against industry standards, the field of bullet- and cartridge-matching has barely advanced, experts say, since it was used in the Sacco and Vanzetti trial in the 1920s. The recent trend across the country is to prove expertise in ballistics through accreditation by a national standard-setting body. Driven by a desire to gain such legitimacy, the BPD claims to be heading towards that goal. But two years into the process it appears that the BPD's ballistics lab hasn't made a dent in fixing its systemic flaws. And in their typical fashion, the department will not concede that anything was wrong to begin with, and they are not hiring anyone with expertise in the field.

Instead, they transferred Lieutenant Catherine Doherty to command the unit. Before joining the lab last December, Doherty conducted background investigations on the department's new

recruits and had never conducted a firearm examination. The department did send her to a training class at the California Criminalistics Institute — more than they've done with any other member of the unit. In many labs, this training would have been the first step, qualifying her to begin a one- or two-year apprenticeship. But at the ballistics unit of the BPD, Doherty has been made the boss, reviewing other ballisticians' work and testifying at trials.

Meanwhile, the other firearms examiners at the BPD have no external training in their craft. (They do occasionally attend classes, sponsored by gun sellers, about the manufacture of their firearm models.) They were all trained solely through apprenticeships — tagging along for a year with a senior ballistician who learned the same way from someone else who learned the same way. If any bad habits or low standards got into the mix, nothing prevented them from being passed down for 40 years. "A lot of problems are very easy to fall into with the apprentice system," says James Gannola, an independent forensic consultant in Brooklyn, New York, who moved the New York City ballistics unit away from that kind of training 10 years ago. Earlier this year he submitted a business proposal to do the same for the BPD, but he never heard back from them.

MISPLACED FAITH

Firearm examiners, more than most other forensics technicians, ask the jury to rely strictly on the results of their expertise. To reach their conclusions, examiners test-fire a suspect gun to create a bullet or cartridge casing, and then compare those to the bullets or casings found at a crime scene. They are looking for "sufficient" corresponding microscopic markings to declare them a match — to say that they must have been fired by the same gun. Explaining to a jury how they arrive at a given conclusion is nearly impossible; it would be similar, some say, to explaining which lines and markings you used to recognize a person's face.

That doesn't necessarily mean that firearm matching is less valid; but it does mean that juries — and detectives, prosecutors, and defendants — must take the examiners' conclusions on faith. Their ability to do the work well is, therefore, of critical importance, which is why most forensics labs employ a quality-assurance manager — although not the BPD, even though the accreditation they want requires one. And an increasing number of labs periodically administer proficiency exams to their ballisticians.

Until two weeks ago, nobody outside the BPD seems to have known whether the department even tested its firearms examiners. Then, on the stand during a pre-trial hearing in Suffolk Superior Court, Detective Tyrone Camper surprised the prosecutor and defense attorneys by saying that in his eight years in the unit, he had been given "four or five" proficiency tests by the unit's previous commander, Mark Vickers, the most recent being perhaps a year and a half ago. In each, he had been given several shell casings and told to determine which of them did and which did not come from the gun provided.

Camper could not recall all of his results, but he knew that he failed some, and he believed that he may have passed some.

A week later, on the stand again, Camper recanted. "I have come to learn that I have not failed any" proficiency tests, he said. "I have come to learn that I have passed them."

In a city and state where the public is obsessed with MCAS results, this sort of happy-go-lucky attitude about expertise and testimony that could send people to prison, in some instances for life, is strange indeed.

It's not clear which tests Camper was referring to; the BPD has not provided test results to either the lawyers in that case or to the Phoenix. As part of the new push for accreditation, the BPD began using Comparative Testing Systems (CTS) of Roanoke, Virginia, sometime in the past two years. CTS is a leading provider of independent tests to forensics labs, and failing its firearms proficiency exam is a rarity. Over the past four years, CTS has compiled results of 1079 firearm-identification tests of that type, including many given to trainees, and only 36 contained any mis-identifications.

The BPD would not answer questions or provide any interviews in response to requests from the Phoenix. Doherty and Camper both declined direct requests for interviews. A public-information request for proficiency-exam results submitted two weeks ago was not fulfilled.

In other labs, failure of any proficiency exam would cause near-panic. At the least, the examiner would be immediately placed in remedial training, and the lab would probably conduct a thorough review of his or her recent work, say supervisors of ballistics labs in other states. "It's an unforgiving field," says Michelle Kuehner, associate crime-lab director for the Allegheny County, Pennsylvania, coroner's office, where she supervises the county's ballistics lab. Her four firearms examiners all take two proficiency exams each year, and none have failed yet. "The lab does not want a person who has made a mistake to continue working in the lab."

In New York City, where the 40 ballisticians take annual proficiency tests, the few who fail are immediately taken off case work, says Gannalo, who helped create and oversee that city's ballistics training and testing program, first as a member of the unit and later as an independent forensic consultant. The ballistician is placed in corrective action, usually including remedial training. The department reviews all of his or her paperwork, and pulls 25 cases at random to review. Only after the department is satisfied with the work, and the ballistician passes at least one new test, does it return him or her to duty.

Not so in Boston.

Whether Camper or any of his colleagues failed remains an open question. The BPD has yet to release evidence of anyone on its ballistics staff having passed a proficiency test, nor have any of them mentioned doing so in court. (Their failure to discuss the matter makes it difficult to determine whether such test results exist.) What we do know is that, if there have been any failures, they have not led to additional training for Camper or anyone else. According to prosecutors in the Suffolk County District Attorney's office, Camper never bothered to inform anyone there that he, their "expert witness," believed he had flunked a test of his abilities.

Camper, who joined the department in 1986 and transferred to ballistics in 1997 after stints as a patrolman, in the drug-control unit, and on the homicide squad, has testified more than 30 times. So has Martin Lydon, who joined the ballistics unit in 2000 after 13 years performing other duties in the department. James O'Shea, a ballistics supervisor since 1998, has testified "hundreds of times," according to his responses in court. All of them were trained solely by the apprentice system.

Many, many people have gone to prison, for many years or for life, based in large part on the claims of Camper, Lydon, and O'Shea, and two others who recently left the ballistics unit. Carl Washington retired earlier this year, and George Foley was transferred out of the unit, for reasons not made available by the BPD. Both men also had testified in hundreds of cases.

In one of those cases, Washington testified against Michael Prochilo in federal court. Prochilo was convicted in 1997 of gun-possession charges and sentenced to 27 years in prison. The conviction was later reversed, and in the retrial Prochilo was acquitted after forensic scientist David Lamagna, of American Forensic Technologies in Andover, rebutted Washington's claims.

In addition to how unreliable their testimony is at trial, Boston's ballisticians are clearly not providing much help tracking down shooters, either. Of the 248 BPD investigations into shooting murders since 1998, two-thirds remain officially unsolved.

SEEING WHAT THEY WANT TO

In much, if not most, of the US, firearms matching is conducted by civilian scientists rather than sworn officers — very often in labs completely independent of any law-enforcement department. In Allegheny County, Pennsylvania, which covers much of western Pennsylvania including Pittsburgh and McKeesport, the lab is part of the coroner's office. In Virginia, four labs operated by the state Department of Public Safety and staffed with civilians conduct all the firearm examinations. Illinois's examiners are civilians, even though the lab itself is part of the state police department.

Even New York City, whose police force can be as territorial and stubborn as Boston's, is beginning to move toward civilian ballisticians, says Gannalo.

One advantage of going civilian is that it vastly increases the quality of the applicant pool. When Kuehner recently hired a new firearm examiner for her Allegheny County lab, she had an embarrassment of qualified candidates to choose from. "There are so many forensics programs around, there's no shortage of applicants," she says. She hired a graduate of a firearms-examination masters program at Virginia Commonwealth University. Camper, by contrast, has testified that he joined the BPD's ballistics unit simply by asking to, even though he had no previous interest in or special knowledge of science or forensics.

Another reason why civilian examiners are better equipped to do this work is that they are removed from the pressure, spoken or implied, to give fellow officers the answer they want to hear. In the forensics field, this falls under the term "confirmation bias," which refers to the tendency, often subconscious, to find a result that you know would be helpful.

But at the BPD, confirmation bias is the modus operandi. Take Camper, who transferred from homicide to ballistics, where his former squad mates and supervisors now bring him evidence they hope will be interpreted in a way that will help build their cases.

In a 1999 murder case, in which the murder weapon was never found, the lead detective gave Camper a cartridge casing found at suspect Roger Dew's house, to match to the ones found at the crime scene. Camper could not find markings that showed that the casing from Dew's house was a match, but he testified that it was "consistent with being fired from the same firearm" as the casings found at the crime scene — even though in fact it would also be consistent with having been fired from any of hundreds, if not thousands, of guns in Boston. (The trial transcript also shows Camper claimed that the casing from Dew's house was "consistent with the spent .380-caliber bullet which was removed [from the victim's body] at the medical examiner's office," an impossible claim to support, since a bullet and casing cannot be compared.) The prosecutor emphasized Camper's findings in his closing arguments, and Dew was found guilty of first-degree murder.

In fact, in two cases the Phoenix knows of, homicide detectives asked the ballistics lab to examine evidence for a match even after their digital-imaging identification system — used to narrow down likely matches — had rejected them. And in both cases, the BPD ballisticians declared that the evidence did match.

If the ballisticians are susceptible to confirmation bias, their new commander appears not even to understand it. In the same murder-trial hearing two weeks ago, Doherty said that the prosecutor approached her on Saturday night, less than 48 hours before trial, to ask her to review the cartridge casings that Camper had previously examined, and be prepared to testify about her findings. Asked by the defense attorney whether this was an instance where confirmation bias might be a concern, Doherty repeatedly insisted that she had no idea that finding a match might be helpful to the prosecutor's case. Her answer makes one wonder if she knew what she was talking about.

CROSSING THE LINE

A Phoenix review of six trial transcripts and testimony at an ongoing trial suggests that BPD ballisticians often seem eager to help the prosecution and stymie the defense. At times they even seem to declare a match on evidence that they know does not justify the claim. That is, when only the "class characteristics" match, but not the "individual characteristics."

To better understand the distinction, envision an assembly machine making thousands of 9mm Ruger handguns. Each gun's barrel is drilled out by the same steel machine, which adds the same spiral grooves on the inside of each barrel, which spin the bullet similar to the way a quarterback throws a spiral pass.

Every one of those 9mm Rugers coming off that assembly line will have exactly the same grooves, which will mark every bullet shot through them the same way. Similarly, parts of the gun that strike the cartridge casing can leave tell-tale markings.

Those are class characteristics, in ballistics parlance, and they can help determine that two bullets, or two casings, could or could not have been fired by guns of the same make — that is, guns whose grooves were made by the same machines.

But inevitably, each barrel coming off that assembly line will contain random, minute imperfections, such as a microscopic bump of steel. Those imperfections will be quite different from those left on another gun coming through the same assembly line, and will leave a unique microscopic mark — "individual characteristics" — on each bullet that passes through. Individual characteristics indicate that the bullet could only have passed through that particular Ruger; again, similar markings can be found on the cartridge casing that gets ejected from the gun. To declare a "match" based on class characteristics alone would be wildly irresponsible — like declaring a vehicle the getaway car because it is a Ford Taurus.

Yet in a federal trial this March, Camper testified that there was no doubt in his mind that four recovered cartridge casings were fired from the specific Astra pistol in evidence, "because they all shared the same similarities, class characteristics." And Carl Washington, in a hearing before the Prochilo retrial in 2000, declared that he would, as a rule, declare a match if all he had was a particular class characteristic which he knew not to be sufficient for an individual match. "If that was all that I had, yes, I would call that a match," he said. That transcript has recently surfaced as part of an attempt, in federal court, to get ballistics evidence in one case ruled inadmissible.

Washington's remarks and Camper's testimony about the Astra baffle other ballistics experts. "If true, that would break all the rules of being an honest examiner," says Gannalo. "If he tries to make a result sound like more than what it is, that's an injustice."

"I like most of the people I work with in the Boston Police Department, and they mean very well," says Lamagna. "But if you don't understand the underlying science behind forensics, it's much easier to make statements overstating the evidence."

Defense attorneys deserve equal blame, says Lamagna, for not learning enough, or hiring experts, to help them catch and challenge these and other questionable claims. Timothy Perkins, an attorney in Ipswich who is also officially recognized by the state's public-counsel office as a firearms expert, agrees. "Are they lying? I don't know. But I know there are some inadvertent errors" in BPD ballistics experts' testimony, Perkins says. "A lot of it has to do with DAs and judges and defense attorneys not knowing very much about ballistics, and glossing over what seems to be a point that really ought to be more strenuously pushed."

That appears to be changing. Local defense attorneys are planning to challenge ballistics experts in several other upcoming cases, both in state and federal court.

Time will tell whether juries will grow skeptical, now that defense attorneys have begun exposing the ballisticians' lack of expertise and credentials. The testimony Camper gave this week is critical to whether a man accused of murder goes to prison for life or goes free. Camper says that a cartridge casing found at the murder scene was fired by a gun found in the suspect's hand two weeks later; it is the only physical evidence linking the defendant to the scene. The jury will decide next week whether they believe him.