UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**

**v.**                                                  Crim. No. 05-10237-MLW

**ANTOIN QUARLES COMBS**

_____

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION IN LIMINE TO EXCLUDE FINGERPRINT TESTIMONY
OR, ALTERNATIVELY, FOR A DAUBERT HEARING**

The defendant has urged the Court to exclude any testimony by the government's fingerprint expert that quite often firearms do not yield identifiable latent prints, that there are numerous reasons for the low recovery rate, and presented with a hypothetical concerning a struggle over control of a firearm, he would not think it unusual that no identifiable latent prints were recovered. In the alternative, the defendant seeks a <u>Daubert</u> hearing on the admissibility of such testimony. The government submits that, although no final determination has been made, at this time the government does not expect to call the fingerprint expert at all[1], and if called, will not attempt to elicit the challenged testimony unless the defense intends to suggest through cross-examination or to argue that the officers must be lying about the struggle or else there would be

---

[1]Informing this decision, in part, is whether the defendant intends to offer expert fingerprint testimony and what his/her anticipated testimony will be. The defendant has not filed an expert disclosure to date.

fingerprints, or that the defendant never touched the gun because his prints were not found, or intends to draw some similar inference about the absence of fingerprints.  In any event, however, the challenged testimony is proper expert testimony, is relevant and reliable under the Daubert/Kumho Tire principles, and will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

   Although the Court certainly must make a reliability and relevance determination under Rule 702, the "trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (quoting United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1966)); Daubert, 509 U.S. at 595-96 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") Moreover, the testimony concerning the difficulty of recovering prints from firearms and the various reasons for this difficulty is important to "educate the factfinder." See Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments ("The amendment does not alter the venerable practice of using expert testimony to

2

educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.")

The evidence here is reliable and relevant. Detective Timothy Sethman has been a fingerprint examiner for nine years, has received hundreds of hours of training in latent print analysis, and has personally examined more than 300 handguns for prints. Detective Sethman certainly can "assist" the trier of fact in understanding how latent prints are (or are not) deposited on various surfaces, including guns, and what factors can influence whether an identifiable latent print is found.

The testimony is also relevant, particularly if the defense attempts to suggest that the absence of the defendant's prints means he must not have touched the gun. In a similar case, the Ninth Circuit upheld the district court's admission of precisely the sort of testimony at issue here. <u>United States v. Burdeau</u>, 168 F.3d. 352, 356-57 (9th Cir. 1999). In <u>Burdeau</u>, defense counsel had cross examined an FBI agent about the results of fingerprint tests conducted on a glass countertop and a firearm in connection with an armed robbery. On redirect, and over defendant's objections, the government elicited testimony that

"identifiable fingerprints are almost never found on guns and only rarely found on other objects submitted for testing." Id. Further, the expert testified as to why that is so, including that "the surface might not be conducive to fingerprints, skin can be too dry to leave a print, or fingers may be moved in a manner that smudges a print." Id. The Ninth Circuit rejected the defendant's argument that the testimony was irrelevant, finding that it "aided the jury in understanding why [defendant's] fingerprints might not be found on items that the jury knew he had touched, which explanation would not otherwise have been readily apparent." Id.

Similarly here, the government anticipates that the officers will testify that there was a fierce struggle with the defendant over control of the gun. After hearing this testimony, a lay person might expect, and based on conversations with defense counsel the government submits that counsel may urge that the jury should expect, that a subsequent forensic examination would yield fingerprints.[2] Accordingly, the expert's testimony could be necessary to avoid misleading the jury.

---

[2] This is particularly true in light of the popularity of some television dramas, notably "CSI:Crime Scene Investigation" and its spin-offs, in which fingerprints are virtually always recovered off every conceivable surface. See e.g., Linda Deutsch, Legal TV Dramas Influence Real Jurors, Associated Press, Jan. 14, 2006, available in Westlaw, APWires database. (A copy of this article is attached.)

Similar testimony has been admitted in numerous federal and state courts.  See e.g., United States v. Carpenter, 403 F.3d 9, 10 n.1 (1st Cir. 2005)("To counter [defendant's] contention about the absence of fingerprints on the weapon, the government adduced expert testimony that it is exceedingly difficult to lift viable fingerprints from the surfaces of this particular weapon."); United States v. Coffee, 434 F.3d 887, 897 (6th Cir. 2006)(in sufficiency of the evidence challenge, "fact that no identifiable fingerprints were found on either of the revolvers is not determinative, particularly in light of the testimony of the government's expert witness...that fingerprints are rarely identified on firearms, the absence of fingerprints does not mean that an item has not been touched, and mechanics' cracked and gouged hands (defendant was a mechanic) are less likely than those of members of other professions to leave fingerprints."); United States v. Castillo, 406 F.3d 806, 810 (7th Cir. 2005)(government expert testified that "guns and ammunition are not very receptive surfaces for leaving fingerprints"); United States v. Williams, 358 F.3d 956, 960 (D.C. Cir. 2004)(government introduced expert testimony that "it was difficult to recover a useful fingerprint from a gun and that the absence of any fingerprints on the gun recovered ...was not unusual."); Commonwealth v. Evans, 786 N.E.2d 375, 391 (Mass. 2003)(state's fingerprint expert testified that guns yield identifiable

fingerprints in only about two percent of cases.); United States v. Almaraz, 31 Fed.Appx. 838, n.1 (5th Cir. 2002)(unpublished)(fingerprint expert testified that prints on gun and its container were too "smudge or blurred" to be suitable for comparison and that this was "in no way unusual."); cf., United States v. Paladino, 401 F.3d 471, 477 (7th Cir. 2005)(holding that rarity of finding identifiable fingerprints on firearms was irrelevant, but nonetheless recognizing that it is indeed rare)(quoting Clive A. Barnum & Darrell R. Klasey, Factors Affecting the Recovery of Latent Prints on Firearms, The Prosecutor, Jan./Feb. 1998, at 32.)[3]

As noted, the government does not presently intend to call the fingerprint expert at trial. If the witness is called, the government does not intend to elicit the challenged testimony unless it becomes responsive to a defense asserted through cross-examination or as a result of any affirmative evidence the defendant chooses to introduce. If in the government's view that

---

[3]Detective Sethman brought this article to the government's attention. A copy of it is attached here.

has occurred, the government will seek guidance from the Court before eliciting such testimony.

>Respectfully submitted,
>
>MICHAEL J. SULLIVAN
>United States Attorney
>
>By: /s/ Sandra S. Bower
>    SANDRA S. BOWER
>    JOHN A. WORTMANN, Jr.
>    Assistant United States Attorneys
>    1 Courthouse Way, Suite 9200
>    Boston, MA 02210
>    (617) 748-3184

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 22, 2006.

>/s/ Sandra S. Bower
>SANDRA S. BOWER
>Assistant U.S. Attorney

Citation                          Search Result           Rank 1 of 2        Database
1/14/06 APWIRES 18:25:40                                                      APWIRES

1/14/06 Associated Press (AP) Newswires 18:25:40

                                  AP Online
Copyright 2006 The Associated Press. All rights reserved. This material may not
          be published, broadcast, rewritten or redistributed.

                              January 14, 2006

                   Legal TV Dramas Influence Real Jurors
                            By LINDA **DEUTSCH**
                         AP Special Correspondent

LOS ANGELES_Reality TV they are not, but two hit shows are so convincing as
imitations of life in the criminal justice system that some legal experts worry
they're distorting the expectations of real jurors.

The influence of the **"CSI**: Crime Scene Investigation" and "Law & Order"
franchises has permeated American law. Lawyers ask would-be jurors whether they
watch the shows and then change strategies depending on the answers. Law schools
maintain video libraries of the programs as teaching tools and even analyze the
plot lines in class.

Which side benefits the most _ prosecutors or defense attorneys _ is debatable.
While "Law & Order" glamorizes prosecutors, **"CSI"** can set standards for the
infallibility of forensic evidence that prosecutors can't often meet _ a
science-solves-all formula that millions of viewers may bring to jury service.

There is no debating, however, one clear, very widespread result of these
programs: The justice system is now facing what legal experts call, "the **CSI**
effect," a TV-bred demand by jurors for high tech, indisputable forensic
evidence before they will convict.

"These programs have a potential for great mischief but also for great
learning," said Laurie Levenson, a Loyola University (Los Angeles) Law School
professor who discusses "Law & Order" in her classes and whose school maintains
a library of episodes.

**"CSI"** dominates network rankings for CBS with versions set in Las Vegas, Miami
and New York, while "Law & Order" and its spinoffs are an NBC stalwart. Both
occupy many hours each day on cable. A single first-run episode of **"CSI'** can
draw 26 million viewers while a "Law & Order" episode averages 11.4 million.
Multiply that by spinoffs and cable reruns, throw in other crime-based series,
and there's a virtual world of crime-show junkies who could end up deciding
guilt or innocence in real trials.

"The expectations of jurors are more elevated," said Elissa Mayo, assistant lab
director for the California Attorney General's Bureau of Forensic Services.

              © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1/14/06 APWIRES 18:25:40                                                Page 2

"They think that we have all the space-age equipment that they see on TV and before you come back from the commercial break you have the results."

In response, scholarly law journals have included articles suggesting that prosecutors warn jurors at the outset that it can be very difficult to obtain forensic evidence and that circumstantial evidence is sufficient to prove a case.

The problem is that many cases have little forensic evidence, notes Michael Asimow, a UCLA law professor who teaches a course on law and popular culture.

"Shows like 'CSI' are teaching people that without forensic evidence you can't convict anybody," said Asimow.

In Baltimore, for example, less than 10 percent of homicide cases in the state attorney's office in 2004 involved fingerprint or DNA evidence. Evidence, instead, often was circumstantial or reliant on eyewitnesses.

In one case, an 11-year-old girl pointed at a defendant and said, "That's the man who shot my father." But jurors found him not guilty. One later explained: "I would have liked to see some evidence, like finding the gun with fingerprints."

In last year's murder case against Robert Blake, prospective jurors were asked whether they could fairly evaluate evidence prosecutors contended would show the former tough-guy actor killed his wife.

"Oh, that's easy," said one prospect. "I'll just go by the DNA."

A prosecutor informed the potential juror there might not be DNA evidence _ and as the case played out there was none. Forensic testimony focused on a smattering of gunshot residue and blood spatter and the claim that police mishandled evidence _ an issue stressed in Blake's successful defense by attorney M. Gerald Schwartzbach.

Schwartzbach acknowledged that jurors probably were more receptive to his hours of laborious cross-examination on scientific details because of their exposure to TV forensics shows _ though he dismisses those shows as "electronic relatives of tabloid journalism."

Hollywood's take on forensics is what millions of viewers get each week as they watch pistol-packing sleuths peer at bloody crime scene evidence and get the bad guy thanks to technology. The fact that a forensic expert with a gun could possibly contaminate evidence doesn't bother Ann Donahue, executive producer and co-creator of **"CSI Miami."**

"What we're doing is entertaining," she said. "It's like a medical show. When you go to the hospital, you're not going to find that doctor you see on TV."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

1/14/06 APWIRES 18:25:40

Dick Wolf, who launched the "Law & Order" franchise 16 years ago, traces his show's roots to a pitch he made to the late NBC chief Brandon Tartikoff for a program based on "the front page of the New York Post."

"And that's still it," he says, "'Headless body found in topless bar' is still a great story."

The "Law & Order" series frequently offers thinly disguised dramatizations of high-profile cases. But Wolf says the shows are more than mere entertainment.

"I think we have raised people's awareness of how the justice system operates, how evidence is obtained, the conflicts between cops and prosecutors, why evidence is excluded that the jury never gets to see," he said.

Defense attorney Thomas Mesereau Jr., who won acquittal for Michael Jackson on child molestation charges in a case with almost no forensic evidence, said he rarely watches **"CSI"** or "Law & Order," but doesn't object to jurors being educated by TV.

"I think we're better off if the public understands what techniques are available," Mesereau said. "I have great faith in American juries and I would like to think that they know a lot of these shows are pure fantasy."

But sometimes that fantasy does alter the reality of a case.

Last year in Texas, the conviction of Andrea Yates in the drowning deaths of her five children was reversed because of an error involving "Law & Order."

Forensic psychiatrist Dr. Park Dietz, a key prosecution witness and one-time consultant for the show, testified that an episode in which a woman drowned her children in a bathtub aired before the Yates killings.

Prosecutors suggested Yates concluded from that episode that she could get away with the murders.

However, it turned out, there was no such episode and Dietz has admitted he was mistaken.

In reversing Yates' conviction, an appeals court said his testimony could have affected the judgment of the jury.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Violent Crime (1VI27); Crime (1CR87); Judicial (1JU36); Legal (1LE33); Social Issues (1SO05); Criminal Law (1CR79))

INDUSTRY:  (TV (1TV19); Entertainment (1EN08); TV Programming (1TV26))

REGION:  (USA (1US73); Americas (1AM92); Florida (1FL79); New York (1NE72);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

1/14/06 APWIRES 18:25:40

North America (1NO39); California (1CA98))

Language:   EN

OTHER INDEXING:   (ANDREA YATES; BUREAU OF FORENSIC SERVICES; CBS; **CSI**; DNA; LAW SCHOOL; LOYOLA UNIVERSITY; NBC; TV; UCLA; YATES)   (Ann Donahue; Asimow; Blake; Dick Wolf; Dietz; Elissa Mayo; Hollywood; Influence Real Jurors; Laurie Levenson; Lawyers; M. Gerald Schwartzbach; Mesereau; Michael Asimow; Michael Jackson; Multiply; Park Dietz; Robert Blake; Schwartzbach; Thomas Mesereau Jr.; Wolf)   (United States; USA; NorthAmerica)

KEYWORDS:   (e)

Word Count: 1264
1/14/06 APWIRES 18:25:40

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FEATURE

# FACTORS AFFECTING THE RECOVERY OF LATENT PRINTS ON FIREARMS

### BY CLIVE A. BARNUM AND DARRELL R. KLASEY

## INTRODUCTION

LATENT FINGERPRINT EXAMINERS GENerally know that even when cutting-edge technology such as cyanoacrylate fuming and laser/forensic light source examination is utilized, successful development of latent prints on firearms is difficult to achieve. In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both literature[1] and the judicial system.[2] Fingerprint specialists at the Bureau of Alcohol, Tobacco and Firearms San Francisco Laboratory Center, however, have had some success in this endeavor.[3]

In the examination of 1,000 firearms from February 1992 through August 1995, 114 identifiable latent prints were developed on 93 firearms. Although successful recovery occurred in approximately one of ten firearms, it should be understood that not all identifiable latent prints may have been left by an offender. Some developed latent prints, for example, are subsequently identified as belonging to a person involved in the collection of the evidence.[4]

Jurors have been inundated with fingerprint information from television, movies and newspapers and feel that latent print evidence is a reliable means of establishing positive personal identity.[5] However, jurors are generally under the impression that every item that is touched by fingers or palms will be left with an identifiable latent print impression.[6] If an offender is arrested for possession of a firearm, jurors, therefore, expect the defendant's prints to be on it. In fact, most of the time, fingerprint specialists find no identifiable latent prints on firearms. Accordingly, attorneys often call on the fingerprint specialist to explain to the jury the many reasons for the absence of identifiable latent prints. The following reasons make latent print recovery from firearms difficult and, when they are recovered, the time of deposition can seldom be determined.



Mr. Barnum was the senior fingerprint specialist at the Bureau of Alcohol, Tobacco and Firearm's San Francisco Laboratory Center at the time of his death in December 1996.

Mr. Klasey is a fingerprint specialist with the Bureau of Alcohol, Tobacco and Firearms at its San Francisco Laboratory Center and is the third vice-president of the California State Division, International Association for Identification.

## LIFE OF LATENT PRINTS

UNLESS THERE IS A WITNESS TO THE offender handling the firearm, there is no way of knowing when the firearm was touched by that person. It could have been days, months or years since the firearm was handled by the offender.

Professor Andre A. Moenssens has studied latent print age determination. In 1972, at the 57th Annual Conference of the International Association for Identification in Milwaukee, Wisconsin, he stated, "I would simply say that I cannot tell with any degree of precision because there is no known way to determine positively, or to even closely approximate by opinion testimony, the length of time a latent has been on an object. You can sometimes establish the length of time a print has been on an object circumstantially, but not scientifically."[7]

Charles R. Midkiff has examined the results of tests done by others. He stated, "[F]rom studies and cases examined, it is apparent that wide variations exist in the ability of a latent print to survive, even under rather harsh conditions. Development of a latent print at a crime scene is no guarantee of its having been recently placed. In addition, the studies suggest that no reliable indication of a print's freshness can be obtained from its rate of development or appearance after it is developed. Speculation or court testimony concerning the time when a latent print was placed may be hazardous to the reputation of the examiner."[8]

## ATMOSPHERIC CONDITIONS

AIR, TEMPERATURE AND WATER ALL HAVE AN EFFECT ON THE survivability of latent prints and their subsequent development. Moderate air currents will cause gradual evaporation of the water portion of perspiration, while stronger winds will cause rapid evaporation but may have little immediate effect on the remaining salts, amino acids, fats and lipids.

Air temperature and the temperature of the surface receiving the latent print can also affect the latent impression. If the surface is hot, it may cause rapid evaporation. A cold surface can eventually create condensation, as in the case of a glass of cold water on a warm day. Generally, less perspiration is secreted during low temperatures.

High humidity can cause moisture to condense on an object's surface, possibly causing the latent deposits to wash away. Low humidity will cause rapid evaporation of the water portion of perspiration because of the lack of moisture in the air.

Rain, of course, will wash away nonfatty/oily deposited latent print material adhering to an object's surface. Dew and snow, much like rain, will adversely affect the latent



print. Not only will they combine with the water in perspiration to dilute the latent print residue, but they may form a barrier between the surface and the friction ridge skin. This barrier may prevent residue from being left in sufficient quantity to be detected.[9]

### ENVIRONMENTAL FACTORS

WHAT HAPPENS TO THE FIREARM BETWEEN THE TIME A latent print is deposited and the time the weapon is recovered can greatly affect the processing outcome. Placing firearms in holsters, in the waistband of trousers, between car seats and under mattresses, to give a few examples, may cause the latent prints to rub off. Latent prints may also be obliterated on firearms that are thrown from moving vehicles onto roadways and into dusty fields or rapidly-running rivers. Offenders have also been known to wipe off the interior and exterior parts of firearms, thereby eliminating any chance of developing identifiable latent prints.

### DAMAGE OF FRICTION RIDGE SKIN

FRICTION RIDGE SKIN CAN BE DESTROYED PERMANENTLY OR temporarily, depending on the circumstances of the trauma. Permanent destruction can occur because of scarring or disease (e.g., dissociated ridges or dysplasia).[10] Temporary destruction is usually due to superficial burns, warts and occupational situations (e.g., construction workers who handle drying material such as lime, plaster or cement or dish washers whose hands are continually wet). All of the above examples will cause the donor to leave very poor or unidentifiable latent fingerprints.

### PERSPIRATION

CONSIDERING PERSPIRATION ALONE, THE AMOUNT TRANSferred from the skin to the object touched is the main factor bearing on the identifiability of latent prints. Perspiration excreted from the fingers and palms is reported to contain from 98.5[11] to 99.5[12] percent water, and 0.5 to 1.5 percent solid matter. There may be insufficient perspiration to which developing agents can adhere, either because there was little initial perspiration on the skin or because one or more objects were handled prior to the evidence being handled. When sufficient perspiration accumulates on the skin, it should yield a clear impression to which developing reagents will adhere. The anxiousness or nervousness of the individual may also have an affect on the secretion of perspiration through the pores.

### PROCESSING PROBLEMS

FIREARMS CAN BE DIFFICULT TO PROCESS DUE TO VARIOUS reasons such as the condition of the metal and the limited smooth area available for processing (most firearms have few smooth surfaces, although an auto-loading pistol generally has more processing area for latent prints than a revolver). In addition, more and more guns, like the Glock pistols, are being produced using polymers instead of metal. These polymer parts usually have textured surfaces that are not conducive to the retention of latent prints.

Fingerprints can also become superimposed or smudged because of the way a firearm is handled or because the surface is dirty, oily or greasy.[13] Usually, the investigator must touch the same areas of the firearm as the offender in order to unload it safely. While many investigators wear gloves when handling evidence, it has been suggested by some that they should not, "but must become accustomed to work in such a way that they do not leave their own prints. If they wear gloves, there is always the risk that they may become careless and destroy prints."[14]

The reason for handling a firearm will determine which surfaces are touched. Persons who discharge firearms usually hold them in a conventional manner, as a matter of safety, using the weapon's grips or its stock. The wooden or plastic grips or the stocks of some firearms are often serrated in order to provide a nonslip means of holding the firearm to fire it. These uneven surfaces usually yield no identifiable latent prints. On the other hand, a firearm being casually inspected, loaded, unloaded or cleaned will be handled much differently from one held for firing. In these instances, more of a firearm's overall surfaces are usually handled, resulting in a greater likelihood that identifiable latent prints will be deposited.

### FIREARM FINISHES

THE TYPE OF FINISH APPLIED TO THE METAL SURFACE OF firearms by the manufacturer, gunsmith or home repair person can have a detrimental affect upon the development of

(continued on page 34)

## LATENT PRINTS ON FIREARMS

*(continued from page 33)*

latent prints. For example, latent prints are particularly difficult to develop on the Parkerized finish found on many military firearms. This type of finish is used on firearms to prevent rust. The metal surface is usually sandblasted prior to the Parkerizing process to produce a nonreflective surface.[15] Weapons with chrome and smooth nickel or stainless steel finishes are better for the recovery of latent prints.

Most of the firearms received at the Bureau of Alcohol, Tobacco and Firearms San Francisco Laboratory Center have been processed by the manufacturer with bluing. The primary object of bluing is to dull the bright color of the barrel and other metal parts.[16] It also helps prevent the metal from rusting. Since perspiration contains 98.5 to 99.5 percent water, bluing may retard latent prints as well.

When referring to a firearm's finish, attorney Richard Dienst stated that firearm "manufacturers such as Intratec advertise and use the slogan 'as tough as your toughest customer' and emphasize that the gun's finish provides excellent resistance to fingerprints.'"[17] Intratec guns are characterized as having a matte nonglare finish that seldom retains an iden-



tifiable latent print. Beretta produces the Model 92F pistol which was adopted by the United States government as the M-0 service pistol. This entire weapon, except the grips, is reported to be covered with a Teflon-derivative coating for protection and lubrication.[18] Almost everyone is familiar with the nonstick qualities of Teflon. Corroded firearm surfaces and badly machined or finished surfaces also make the development of latent prints difficult.

### PACKAGING THE FIREARM

WHEN FIREARMS ARE SUBMITTED TO A CRIME LABORATORY for latent print examination, the sender should use a sturdy box with the firearm tied or strapped to the bottom of the box. Boxes designed specifically to transport and store firearms are available from several vendors.[19] Paper, plastic bags and foam packing chips tend to smudge latent prints during handling, so whenever possible, the firearm should be shipped in a box that is not packed with these materials in close contact with the firearm surfaces.[20]

### CONCLUSION

THERE ARE A NUMBER OF FACTORS THAT AFFECT THE FINgerprint specialist's ability to recover identifiable latent prints on firearms. These are: the longevity of a latent print due to how it was deposited, atmospheric and environmental conditions, perspiration variation, the nature of the firearm's surface and finish, how the firearm was handled and packaging. Due to the reasons stated in this article it is difficult to obtain identifiable prints from firearms; but the attempt should be made since, in the experience of the authors, prints are recovered almost 10 percent of the time.



It is important that fingerprint specialists be able to describe the reasons why, despite their training, experience and access to state-of-the-art equipment, identifiable latent prints are developed on firearms infrequently. So-called "negative results testimony" can be an important part of the judicial process, as it presents a more complete account of latent print processing and will allow the absence of identifiable latent prints to be put into proper perspective.[21]

---

The authors wish to thank A.T.F. Firearms and Tool Mark Examiner John E. Murdock for his assistance.

*This technical report originally appeared in the* Journal of Forensic Identification, *Volume 47, Number 2, March/April, 1997, 140-48 and is reprinted with permission.*

For further information on this subject, please contact: Darrell R. Klasey, Fingerprint Specialist; Bureau of Alcohol, Tobacco and Firearms; San Francisco Laboratory Center; 355 North Wiget Lane; Walnut Creek, California 94598 (510) 486-3170.

### ENDNOTES

[1] R.D. Olsen, *Scott's Fingerprint Mechanics* (Springfield, Illinois: Charles C. Thomas, 1978), 417. J. Miller, "Latent Impression From a Ribbed Shotshell," *Journal of Forensic Identification*, 43, no. 6 (1993): 571. J.D. Ferrara, *Latent Print Processing* (New York: New York City Police Department, 1984), 26-27.
[2] Scott v. Henrich, 978 F.2d 481 (9th Cir. 1992).
[3] The standard approach to latent print processing at the bureau of Alcohol, Tobacco and Firearms San Francisco Laboratory Center is atmospheric cyanoacrylate fuming, followed by staining with ethyl alcohol-based Rhodamine 6G, and examination with an Omnichrome Laserprint 1000 portable laser. Additional processing techniques can include the following: Coherent 20-watt argon laser, Omnichrome Omniprint 1000 Alternate Light Source, ardrox, ultra-violet light, standard and magnetic fluorescent powders, standard and magnetic black and silver powder, Polaroid high-contrast photography and crystal violet.
[4] Of 114 latent prints developed, 24 were identified as coming from an offender and one was identified as coming from a law enforcement employee. To put the number of identifications in proper perspective, several factors should be considered.

*(continued on page 38)*

## TRIAL TECHNIQUE

SECOND EDITION

- Revised for the first time since its original publication in 1977.
- Updated and supplemented with materials reflecting today's prosecutorial issues.
- Available exclusively to our readers through this offer.

**ACT NOW TO GET YOUR COPY AT THIS SPECIAL PRICE**

**$25** INCLUDING SHIPPING

**NDAA**

TO ORDER YOUR COPY TODAY, CALL NDAA AT
**703-549-9222**
OR MAIL OR FAX THE COUPON BELOW

---

**YES!** PLEASE SEND ME _____ COPIES OF TRIAL TECHNIQUE PREDICATE QUESTIONS @ $25 EACH TO:

Name_____

Address_____

City _____ State____ Zip_____

Phone_____ Fax_____

[ ] Enclosed is check for $_____, payable to NDAA. Virginia residents add 4.5% state sales tax.

*Mail order to National District Attorneys Association, 99 Canal Center Plaza, Suite 510, Alexandria, VA or FAX orders to 703-836-3195. All orders shipped via U.S. Postal Service. Allow 3-4 weeks for delivery.*

---

## LATENT PRINTS ON FIREARMS
*(continued from page 34)*

First, the authors' laboratory, one of three regional A.T.F. forensic laboratories, provides forensic services to 14 western states and the territory of Guam. Since there are no fingerprint files maintained at the San Francisco Laboratory Center, the authors are dependent on federal agents and police officials to submit inked fingerprints or rap sheet information.

Additionally, in cases where identifiable latent palm prints are developed on firearms, inked palm prints are virtually never submitted for comparison. In most cases where an offender's inked fingerprints are submitted for comparison and not identified, no elimination fingerprints are submitted for comparison. Most unidentified latent fingerprints are submitted to the California Department of Justice for a search of the cal-id and the Western Identification Network (W.I.N.), if appropriate, for a search of the automated latent print system.

5 C.P. Illsley, "Juries, Fingerprints and the Expert Witness," (Paper presented to the International Symposium on Latent Prints, FBI Academy, Quantico, Virginia, July 1987), 13, 15-16, 19.
6 S. Allen, "Separating Fingerprint Fact From Fiction," Law Enforcement Technology, 19, no. 1 (1992): 24-25.
7 P.L. Johnson, "Life of Latents," Identification News, 23, no. 4 (1973): 10-12.
8 C.R. Midkiff, "Lifetime of a Latent Print, How Long? Can You Tell?," Journal of Forensic Identification, 43, no. 4 (1993): 390-391.
9 Johnson, "Life of Latents," 10-12. J.F. Cowger, Friction Ridge Skin (New York: Elsevier, 1983), 109.
10 Dissociated ridges resemble short curved or dotted ridges over an area of the pattern, while dysplasia results in pattern-less surfaces.
11 A.A. Moenssens, Fingerprint Techniques (Philadelphia: Chilton, 1971), 29. B.A.J. Fisher, A. Svensson, and O. Wendel, Techniques of Crime Scene Investigation, 4th ed. (New York: Elsevier, 1987), 78.
12 G.C. Goode and J.R. Morris, "Latent Fingerprints: A Review of Their Origin, Composition and Methods for Detection," United Kingdom Atomic Weapons Research Establishment Report, 22/83 (October 1983): 9. R.D. Olsen, "The Chemical Composition of Palmar Sweat," Finger Print and Identification, 53, no. 10 (1972): 5.
13 P.L. Kirk, Crime Investigation (New York: Wiley, 1974), 407.
14 Fisher, Techniques, 76. F.R. Cherrill, The Finger Print System at Scotland Yard (London, England: Her Majesty's Stationery Office, 1954), 116.
15 Olsen, Fingerprint Mechanics, 416-17.
16 J.V. Howe, The Modern Gunsmith, Volume II (New York: Funk & Wagnalls, 1954), 209.
17 R. Dienst, "Police Officer Down—What Should Police Unions Do?," The Gold Shield, 9, no. 2 (1995): 7-8.
18 K. Dockery, Compendium of Modern Firearms (Berkeley, California: R. Talsorian Games, Inc., 1991), 22.
19 Two that the authors are familiar with are: Lightning Powder Company, Salem, Oregon (800-852-0300) and Evi-Pac, Phoenix, Arizona (800-377-0450).
20 C.A. Barnum, "Handling and Packaging of Evidence for Fingerprint Examination," (California State Division, International Association for Identification Ident-O-Gram Newsletter, November 1987).
21 D.R. Klasey, "Questions For Qualifying In Court When Latent Fingerprints Are Not Found" (Paper prepared for the FBI Administrative Advanced Latent Fingerprint Course, Quantico, Virginia, September 1993).