UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR. NO. 05-10237-MLW |
| ) | |
| ANTOINE COMBS QUARLES ) | |
| _____) | |

**DEFENDANT'S SENTENCING MEMORANDUM
AND REQUEST FOR A VARIANCE**
_____

Defendant, Antoine Combs Quarles, submits this sentencing memorandum to request a variance from the guideline range calculated in his Presentence Report ("PSR") to a sentence of imprisonment that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Specifically, defendant submits that the fifteen-year (15) sentence set forth in 18 U.S.C. § 924(e) is more than sufficient to satisfy the purposes set forth in § 3553(a) as they apply in this case to this defendant. Accordingly, for the reasons set forth herein, defendant requests that a sentence of imprisonment of fifteen (15) years or 180 months be imposed in this case.

**I.      PERSONAL BACKGROUND.**

Mr. Combs Quarles is 32-year old African American who was born and raised in the Columbia Point Projects in Dorchester, Massachusetts. He is the son of Robert Louise Quarles Sr. and Vanessa Combs. His parents never married.

However, prior to Mr. Combs Quarles' (hereinafter "Quarles") birth, his father was married to a woman named Betty Quarles. Quarles' father and Betty Quarles had six (6) children together. Ms. Quarles also had three (3) children from a prior relationship.

Apparently, when Quarles' father met his mother, Vanessa Combs, he moved out of his marital home with Betty Quarles and starting living with Ms. Combs. Quarles' father had two (2) children with Ms. Combs, Quarles and his sister, Mia Combs.

Quarles' parents had a stormy relationship. His mother had a serious alcohol problem and his father was abusive to both Quarles and his mother. Quarles' parents only lived together until he was 6 or 7 years old. Quarles' mother moved out of the family home after a violent incident in which his father hit his mother so hard that he broke her jaw. Thereafter, Quarles only saw his mother occasionally because she was terrified of his father. Quarles never lived with his mother after his father broke her jaw. According to Quarles, his mother died from "drinking" in 1994. His father did not attend his mother's funeral.

Quarles' relationship with his father was also very volatile. Indeed, after his mother left the family home, his memory of his relationship with his father was that his father regularly punished him for things that he did, as well as things that his sister and friends did. He admits that sometimes he deserved to be punished, but oftentimes he was punished for no reason. His father would mete out punishments like "no television for two months" and "can't go outside for a month." Ironically, he describes living with his father as "feeling like he was in prison."

By the time Quarles was fourteen (14), his relationship with his father had deteriorated to the point that his father sent him to live with Betty Quarles. Specifically, Quarles recalls that when he started dating Millicent Jaundoo, his father told him that he was too young to have a girlfriend and, as a result, he "got smart" with his father. At that point, his father attempted to "rip his head off his shoulders for being insolent" and would

2

have if his brother, Jeff, did not protect him. After this incident, his father told his wife, Betty Quarles, (who was not living with him at the time) to take Quarles away from him because "he did not want to look at him." From this point on, Quarles lived with Betty Quarles.

Quarles describes the projects in which he lived growing up, the Columbia Point Projects, as like "Hell's Kitchen". The Columbia Point Projects in Dorchester are in close proximity to South Boston. Quarles recalls that during his formative years, there were significant race issues between Dorchester's African American community and South Boston's Caucasian community. He recalls witnessing violent confrontations between the two communities at least four times per week. As a young boy, Quarles also recalls that half the buildings in his neighborhood were abandoned and that he would often find dead bodies in these buildings while playing with friends.

Quarles went to live with Betty Quarles and her numerous children around the time he entered high school. Abandoned by his biological mother and father, Quarles considered Betty Quarles his mother, although she has never adopted him. Not surprisingly, Quarles had numerous difficulties during his high school years.

Quarles attended numerous high schools in the Boston area; however, he did not earn a high school diploma until he completed a program at the South Bay Correctional Facility sponsored by the Boston Adult High School in Boston. Quarles began high school at Dorchester High School. He began his sophomore year at South Boston High School, where he lasted 3 days before being sent back to Dorchester High. A few months into his sophomore year at Dorchester High he was caught with a knife. As a result, he was sent to the McKinley School.

While at the McKinley School, he was involved in a number of fights as a result of problems with other students who did not like him because of the neighborhood in which he was raised.  As a result, Betty Quarles filed a CHINS petition against him because she was concerned that he was on the "path" to getting into trouble and would become involved in gang activity.  Thereafter, Quarles was placed in the Hayden School, a school operated by the Department of Social Services ("DSS").  Quarles completed the eleventh (11th) grade at the Hayden School.  During his senior he was sent to Charlestown High School.

Quarles remembers that there was a great deal of gang activity at Charlestown High School during his senior year.  In addition, he did not complete his senior year in Charlestown because he was expelled for reportedly being a "bad influence."  Also, he was incarcerated during what would have been his senior year at Charlestown High.  Ultimately, as noted above, he received a high school diploma after he completed a program at the South Bay Correctional Facility.

During high school, Quarles also became a father for the first time.  His oldest son, Antoine Quarles, now age 16, was the result of Quarles' union with a woman named Millicent Jaundo.  The following year, Quarles fathered Dana Jackson, now age 15, with a women named Keisha Jackson.  Quarles also fathered two daughters, Shacora Winbush, now age 13, with a woman named Wimby Winbush and Akashanytae Quarles, now age 2, with a woman named Heidi Anne Boykin.  Quarles also has been told that he is the father of another child with a woman named Juliette Scott; however, he has never seen this alleged child.

Like his father before him, Quarles none of the relationships with the mothers of his children is ideal. Some of them have secured restraining orders against him. Nevertheless, Quarles has attempted to maintain a relationship with his children with some success. The year his father died, Quarles married a woman named Karen Andre Quarles. Although Quarles and Karen Andre Quarles have not had any children together, they remain married.

Since high school, Quarles has worked a number of minimum wage jobs during the periods he has not been incarcerated. These jobs include a stock boy for a liquor store, a field maintenance worker at Fenway Park, a customer service position at a retail fudge store, a dishwasher, a newspaper support person, and a babysitter. Over the years, Quarles has had great difficulty obtaining employment as a result of his criminal record.

Finally, Quarles has had a substance abuse problem for "as long as he can remember." Indeed, since he was a teenager, Quarles has consumed alcohol and smoked marijuana nearly everyday. After his mother died, Quarles' alcohol consumption increased to the point where he was getting drunk until he passed out. It is likely that many, if not all, of Quarles' problems stem from his serious substance abuse.

## II.    REQUEST FOR A VARIANCE.

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a)(2). 18 U.S.C. § 3582 further instructs the Court to "consider the factors set forth in section 3553(a) to the extent they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*" (Emphasis added).

However, in this case, pursuant to 18 U.S.C. § 924(e), Quarles is facing a mandatory minimum sentence of fifteen (15) years. In addition, based on a total offense level of 33 and a Criminal History Category of VI, Quarles is also facing an advisory guideline imprisonment range of 235 to 293 months (19.6 to 24.4 years).

Quarles submits, by and through undersigned counsel, that the Court should impose the mandatory minimum sentence in this case because a 15-year sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a).

> A.   A 15-YEAR SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO COMPLY WITH THE PURPOSES SET FORTH IN 18 U.S.C. § 3553(A).

In our constitutional system, the power to define penalties for federal crimes belongs to the legislative branch of government. *United States v. Evans,* 333 U.S. 483, 486, 68 S.Ct. 634, 92 L.Ed. 823 (1948). However, federal courts possess the discretion to tailor individual sentences within the boundaries set by the statutory framework, subject to the limitations imposed by Congress. *See Mistretta v. United States,* 488 U.S. 361, 364, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

Matters of policy typically are for Congress. *See, e.g., Plumley v. S. Container, Inc.,* 303 F.3d 364, 374 (1st Cir.2002) (explaining that "it is Congress's mission to set the policy of positive law," whereas a court's role is "to interpret that law"). A corollary to this principle is that, in the absence of constitutional infirmity, federal courts are bound by Congress' policy judgments, including judgments concerning the appropriate penalties for federal crimes.

The creation of the Sentencing Commission and the inauguration of a guideline sentencing scheme were valid exercises of congressional authority to fix penalties for federal crimes and, concomitantly, to cabin judicial discretion. *See id.* at 412. So too was Congress's adoption of a mandatory minimum sentence of 15 years for a felon in possession of a firearm with at least three prior violent felonies or serious drug offenses or both. *Cf. United States v. Singleterry*, 29 F.3d 733, 739-41 (1st Cir. 1994).

However, Congress's authority in this area is not unbounded. In *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court identified a constitutional infirmity in the sentencing guidelines. *See Booker,* 125 S.Ct. at 756. The *Booker* Court held that mandatory sentencing enhancements triggered by judge-found facts were in derogation of the constitutionally assured right to trial by jury. *Id.* (citing U.S. Const. amend. VI). To cure this infirmity, the Court excised the statutory provision that made the sentencing guidelines binding on the federal courts. *Id.* at 756-7.

This surgical strike rendered the guidelines effectively advisory and freed sentencing courts to tailor individual sentences in light of the factors enumerated in 18 U.S.C. § 3553(a). Those § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment ⋯; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for ⋯ the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ⋯; (5) any pertinent policy statement ⋯; (6) the need to avoid unwarranted sentence disparities among defendants with similar records ⋯; and (7) the need to provide restitution to any victims of the offense.

7

As a result of the decision in *Booker*, District Courts now possess greater flexibility in reaching individual sentencing decisions.

B.    18 U.S.C. § 924(e) REQUIRES A MANDATORY 15-YEAR SENTENCE FOR A FELON IN POSSESSION OF A FIREARM WITH A CRIMINAL HISTORY LIKE QUARLES.

Applying the § 3553(a) factors to Quarles' case strongly suggests that a mandatory sentence of 15 years is appropriate in this case.  Indeed, Quarles submits that the penalty provision in 18 U.S.C. § 924(e) constitutes a policy judgment by Congress that a 15-year sentence is appropriate and reasonable in most cases involving an individual with Quarles' criminal history.

Clearly, 18 U.S.C. § 924(e) is evidence that Congress determined that the nature and circumstances of the crime, to wit, a felon in possession, and the characteristics of Quarles (i.e., a defendant with at least three (3) prior violent felonies or serious drug offenses or both) warrants a mandatory minimum 15-year sentence.

It is also clear that a 15-year sentence was determined by Congress to be sufficient to reflect the seriousness of the offense;  to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.[1]

Finally, although the applicable advisory guideline range in this case is greater than the mandatory 15-year sentence contained in § 924(e), the reality is that if Quarles had not exercised his right to a jury trial and entered a plea of guilty, his guideline range

---

[1] Unfortunately for Quarles, because he has history of violent felonies, he will not be eligible for the 500-hour intensive drug treatment program that the Bureau of Prison offers and that can reduce his sentence by as much as 12 months.  Accordingly, the sentence imposed in this case will not provide him with the drug treatment he likely needs.

would have been within the 15-year range that Quarles submits is reasonable under the circumstances in this case.[2]

  B. Consideration of a number of forbidden factors present in this case provides further support for the reasonableness of a 15-year sentence.

In *United States v. Smith*, --- F.3d ----, 2006 WL 893622 (1st Cir.(Mass.), the First Circuit held that a discouraged or forbidden factor under the guidelines does not automatically make it irrelevant when a court is weighing the statutory factors apart from the guidelines. The guidelines--being advisory--are no longer decisive as to factors any more than as to results. Rather, these factors, like the extent of a variance, have some bearing on the reasonableness of a sentence. *Id*.

Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are usually not relevant grounds for determining whether a departure is warranted. *See* U.S.S.G. § 5H1.12. However, this factor, to the extent it is relevant to a variance, has some bearing on the reasonableness of a sentence. *Smith* at 893622. In this case, the lack of guidance as a youth is not only present, it is extraordinary in the sense that since the age of 6, Quarles has had a horrible relationship with both his mother and father and by the age of 23 he was an orphan.

Moreover, the reason for Quarles' horrible relationship with his mother was not limited to the fact that she had an alcohol problem. Rather, Quarles' broken relationship with his mother was a direct result of his mother's drinking and his father's violence. Thus, Quarles' lack of guidance as a youth was not limited to his absentee mother.

---

[2] If Quarles had not exercised his constitutional right to a jury trial, his total offense level would have been a 30 which, given a criminal history of VI, would have warranted a sentenced between 168 and 210 months. Thus, a 15-year or 180 month sentence would have been within the applicable guideline range. Quarles submits that he should not be penalized for exercising his constitutional rights in this case given the lengthy sentence he faces.

9

Rather, by the time Quarles was entering high school at age 14, he had been abandoned by his mother and father and forced to fend for himself.

It does not take a psychologist or psychiatrist to realize the detrimental and permanent impact these devastating circumstances had on Quarles' development. He was abandoned by his mother because of his father's violence and his father became a symbol of arbitrary violence. As a result, Quarles had no chance of growing up in a secure, nurturing and supportive environment.

Not surprisingly, Quarles attempted to lose himself in alcohol and marijuana. Indeed, given that his mother abandoned him when he was 6 or 7 and his father discarded him when he became a teenager, it is extraordinary that Quarles is still alive today. Moreover, while drug or alcohol dependence is not a reason for a downward departure, *see* U.S.S.G. § 5H1.4, it does help explain why Quarles has lived the "life" he has since he was 14 years old.

Finally, even though under most circumstances race and socio-economic status are not relevant in determining a sentence, *see* U.S.S.G. § 5H1.10, it is difficult to understand how anyone can ignore the fact that Quarles' race and socio-economic status have played a huge role in his life circumstances and criminal history.

In summary, a careful review of the circumstances in this case leaves one with feelings of despair and guilt. Feelings of despair because Quarles is just one of many young men who have lost their way and have little hope of a bright future. Feelings of guilt because Quarles never really had an opportunity to excel in our American society.

If this Court imposes a 15-year sentence, when Quarles is released he will still be a relatively young man. It is possible that he could have a meaningful role in the lives of his children. Meaningful interaction with his children could stop the cycle of hopelessness and violence that Quarles' father and mother fostered.

Finally, a 15-year sentence is more than adequate to pay Quarles' debt to society for the crime in this case.

## II.   CONCLUSION.

WHEREFORE, Mr. Combs Quarles, by and through undersigned counsel, respectfully requests the Court to impose a 15-year sentence of imprisonment because said sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a).

Respectfully submitted,
For Defendant,
Antoine Combs Quarles
By his attorney,

  /s/   Scott P. Lopez
Scott P. Lopez BBO #549556
Law Office of Scott P. Lopez
24 School Street
Boston, MA  02108
(617) 742-5700

Dated:  June 22, 2006

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 22, 2006.

   /s/ Scott P. Lopez
Scott P. Lopez